I believe the error that was made here by the district court was it was taking two of a narrow reading of the FHA, the Fair Employment and Housing Act, administrative complaint. Now, it's true that the actual administrative complaint that was filed by the plaintiff in this case didn't specifically list a retaliation claim. But, in fact, at that point You didn't list it at all. That's correct. But I will point out that the actual FHA complaint at that time didn't even have a retaliation box to check off. It was a very primitive form at that time, which is much different now. But the rule that we cited to the district court judge in this case was that you have to look beyond just the administrative complaint. You have to look at what actually occurred or would have occurred in the investigation. Well, you have to look at what she put them on notice of and construe it broadly. But I guess the question that I guess would you concede that initially she didn't put them on notice of it at all, but then you're trying to pull in the, I think, when they asked for the NIS statement. Right. Well, actually, the I mean, her retaliation essentially was that if you were suspected of writing the letter that bad things happened, right? Correct? Correct. And, obviously, that testimony came out at trial. And it was something that she knew. Why wouldn't, you know, you wouldn't have to as an individual, I mean, you know the things that you're wronged about. And it went to sort of the core of her claim that she was suspected of the letter writing that negative things, you know, that retaliation occurred after. You don't need to even use those words. But she doesn't say anything about that. Well, actually, I'm sorry. I misspoke. At the time she filed the FIHA administrative complaint, she had no idea that they suspected her of being involved in the anonymous letter. What she thought is that she was being denied the promotion, which was listed in the FIHA complaint. It was that one incident of being denied promotion was in there. And she believed it was because she was being discriminated against based on her gender because there was a couple of off-color comments made by her supervisor. Now, this is often the problem. When a plaintiff goes without a lawyer and fills out one of these forms, they often don't know the truth facts, especially in this case where the actual defendant who did know the truth facts, the assistant district attorney, wasn't telling anybody what was going on. My client had not been had a conversation with him where he told her, hey, you know, the reason you were denied 11 transfers and the reason why you were denied all these promotions is because I know you're involved in a letter. Now, at the time she filed the administrative complaint, she had no idea that's why she was being persecuted. However, in the course of the investigation — So let me make one thing. So at that point, you acknowledge that the complaint made no reference to retaliation? Well, yeah. It wasn't supposed to. You can't have it both ways. You can't tell me she didn't know, but she put them on notice of it. So I think we have to say if she didn't know it at that point, she couldn't have put them on notice of it. No, I agree. I don't think the administrative complaint puts them on notice of a retaliation legal theory. The only thing in the complaint factually is that I was denied a promotion. And then in the course of the investigation, she provides the DFVH with more information. And specifically in the letter she writes to the DFVH, which is at a plaintiff's record — I'm sorry, an appellant's record, page 331. In the last paragraph of that letter, she says, oh, by the way, I'm attaching and enclosing a declaration of Rosemary Fisher Naya to this letter. And in that letter to the DFVH, she says it explains why there's retaliation going on against employees of the child support division. So in her letter to the DFVH, she actually does use the word retaliation and then says — But how does she put that in a nexus to her? But not against her. Well, no. In connection with her. Actually, that's not correct. In the letter to the DFVH, the supplemental letter, in the last sentence, she says, if you read this declaration, I think it may explain what's idea that she had been singled out as the author of the letter. However, had the DFVH read the declaration of Ms. Fisher Naya that was submitted to the DFVH, it states very clearly that Mr. Boyd was intent on finding out who wrote the anonymous letter and punishing him by way of denying transfers and promotions. So — and Ms. — my client actually — But what tells them that that's Centner? Well, it doesn't. I agree. However, had they called Ms. Fisher Naya and they had talked to her, they would have found out that Ms. Centner had been singled out as the author of the letter. And the letter itself, of course, lists out the various things going on in the child support division, including the poor treatment of women, the flaunting of the affair between the assistant DA and one of the top supervisors. So — and that came out at trial. So we know what the DFVH would have found out had they actually contacted either Ms. Fisher Naya's lawyer or contacted Ms. Fisher Naya — Naya herself. Because she would have told them, yeah, Ms. Centner was the one who they singled out as the author. And I was told to deny all promotions and deny all transfer requests. If they look at the letter itself, they would have seen that in that letter there's a complaint about the improper misconduct of women in the office and the flaunting of the sexual affair. And also low morale based on what was perceived to be quid pro quo. In other words, that this supervisor was being promoted up the chain of command because she was having an affair with the head of that office. So you're essentially saying that the reason that we didn't know about the retaliation was because they did a faulty investigation? That may be, but that's not imputed to my client when they do that. You know, the standard is, had they contacted this woman, Ms. Fisher Naya, what would they have found out? And I think it's reasonable for them to have found out that — So she couldn't figure it out enough to make the complaint, but they're supposed to have figured it out based on what she told them? Well, remember, when she first filed the complaint, correct, she did not know why she was being persecuted. It wasn't until the investigation was ongoing that she started figuring it out, and that's why she contacted them and gave them self-denial information, which was clear what was going on. And certainly, armed with that information, the DFEH should have been able to find out, well, there was a retaliation claim. And by the way, she actually used the word — she did use the word retaliation in her self-denial letter to the DFEH and said, look at the Fisher Naya declaration. Contact Ms. Fisher Naya, and that may explain what's happening to me. And this is, again, before the time when she actually knew she had been singled out as the author of the letter. I mean, I think as a matter of policy, how can it be fair? Because in many cases, a plaintiff will not know the true reason for an employer's adverse employment actions. If that's the standard, then, you know, for the true reasons in an administrative complaint, many times the employer will be able to hold that administrative complaint up later and say, uh-huh, you know, sorry, at the beginning of this action, you had no idea what was really going on. Maybe in discovery you figured it out, you took some depositions and you figured it out, but your case is dismissed because you didn't figure that out when you first filed the administrative complaint. I don't think that's the policy of the Ninth Circuit or even of California law. Because in the Ninth Circuit, I think the standard is you look at a plaintiff has exhausted their administrative remedies if the claim falls within the scope of the investigation. The retaliation claim under FIHA clearly fell within the scope of the investigation. Or the investigation you think should have been conducted. Well, in a minute, I guess the DFEA should have probably contacted Ms. Fischer-Knight as lawyer or contacted Ms. Fischer-Knight herself. Is that something different? I mean, you could say it fell within the scope of the investigation, only you apparently observed that they didn't investigate. So is their case law supporting the proposition or if it fell within the scope of the investigation if the investigators have been more diligent and indeed more diligent than the complainant herself? I think actually that was sort of an issue raised in one of the cases we cited. It was a BKB versus Maui police. In that case, it was a woman who was subjected to horrible treatment by her employer, the police. And when she interviewed with the EEOC caseworker, the caseworker did not put in the actual EEOC charge, sexual harassment. It was just listed as a gender discrimination case. And then she filed a lawsuit and the police department defended saying, wait a minute, there was no mention of sexual harassment in the EEOC complaint. It was just listed as gender discrimination. But what the Ninth Circuit did is they looked at, well, let's see what information was actually in the pre-complaint questionnaire. And in that pre-complaint questionnaire, there was information about sexual harassment. They also looked at the declaration of the actual EEOC caseworker who said, oh, yeah, I think I made a mistake there. I should have also put in sexual harassment. So the complainant put before the agency information, and yet your complainant didn't make that complaint. And what you're pointing to in terms of what information the complainant put before the agency is a declaration by somebody else in a different case that doesn't mention Centner. And you say the agency should have picked up on that anyway to figure out that it should have referenced Centner. That's what I mean. I think this is a step further. You're saying what should have been done in the investigation, not information that the agency necessarily had. Well, I think the standard is what should the agency, you know, what kind of investigation reasonably should have come out of the complaint. And here I think it was more than reasonable for the DOPH to have picked up the phone because Ms. Centner provided the phone number for Ms. Fisher-Nyhan's lawyer and Ms. Fisher-Nyhan herself. So I think one simple phone call would have been made to Ms. Fisher-Nyhan, and she would have said, yeah, Frankie Centner was signaled out as the author of the letter, and I was told not to promote or transfer it. I don't think that's too much to ask. I think that's reasonable. But let me get to the other part of this issue, which is I can't figure out what difference it could possibly have made. We've got a jury verdict that says there was, did not hold the district attorney or the county liable, did hold Mr. Boyd liable, but found the damages to amount to $3,400, something like that. Aren't those factual determinations equally applicable to this claim? Well, no, Your Honor, I don't think so. The difference is in the 1983 free speech retaliation claim, the verdict was against the assistant district attorney only and not against the county. But whereas under the FEHA, if Mr. Boyd is also liable under the FEHA claim, then the county is just automatically liable there. For $3,400. Well, that's a separate issue, and that's the other issue we raised. Why is it separate? $3,400 is $3,400. That's what the jury determined was the damage suffered by your client for retaliation. It's not going to matter who's responsible for the retaliation if it's still the same $3,400. You challenged that amount separately. It seems to me that doesn't answer your whole FEHA issue stands or falls on whether it made any difference, and I can't see how it made any difference. Well, for one, I think it would make a difference in the first instance because when the jury was deliberating, it decided, well, we're only going to hold Mr. Boyd liable. For whatever reason, they didn't hold the county liable. But if they had known on the FEHA claim that if they find Mr. Boyd liable, they have to find the county liable, who knows, that may have changed the damage award. But fundamentally The authority that says that supports your legal argument that we're supposed to disregard the jury's calculation of damages because they might have done something different? Yes, Your Honor. I think the argument we made is that allowing the bankruptcy petition into evidence. You're trying to shift to that issue, and I'll let you, but that doesn't answer the question I've posed, which is you're trying to get us to disregard the jury's calculation of damages. And so far, I haven't heard any reason why we should. And if we don't, then I don't see how the FEHA issue gets anyplace. Well, Your Honor, it's different because the destruction between the 1993 claim and the FEHA claim would have been different. In fact, in the instructions to the jury in closing argument, we said... What's different about damages? Well, it's a big difference. Again, under the FEHA claim, if Mr. Boyd is liable, then it's like strict liability to the county, which wasn't the same under the free speech act. How does that affect the calculation of damages? Well, if the jury's looking at who are we going to award damages against, I can think that could influence the jury potentially as to how much they're going to... So I'll ask the question I asked a minute ago. Do you have any legal authority for this proposition that we're supposed to disregard the jury verdict because the identity of the defendant is different? Your Honor, other than just general, I think it was prejudicial to allow that evidence in, no. I think that's... Okay. And getting to that argument about the bankruptcy petition, it's no coincidence, I think, that the jury awarded the exact amount down to the penny that the plaintiff had put on the exempt value. Well, I think if you prevailed on this argument, you certainly could show prejudice because they picked the amount from that. So clearly the jury, that's where they got it. But the question is, it's an abuse of discretion standard, correct? Correct. All right. Which is always a rock you're pushing uphill. It's a tough one to overcome. I have a hard time seeing why it's not relevant when she signs something under penalty of perjury as to what her damages are, and particularly when the discrepancy is $3,400 and a million dollars, why that wouldn't be admissible. Now, I understand that you don't probably... She didn't have a lawyer to talk to to say that you were really... But if it were the difference between $3,400 and now the court could have said, well, okay, maybe she didn't know that she was entitled to certain damages along, but $3,400 to a million. Yeah, I think you're right. I guess the answer is the mistake in the bankruptcy petition was so clear and obvious because the $3,400 was put in the exempt value of the case, meaning the amount of money, if she won, she'd be able to keep in bankruptcy. And then the next column is the actual value of the case. Well, those are all good arguments, but when the court weighs it, clearly is a probative value to it. So how do we say that the court was clearly wrong in weighing them that way? And I agree, there is a probative value, but I believe the prejudicial value far outweighed the probative value here because it was clearly... It's prejudicial only if you say it has no probative value. If it's got probative value, then it seems to be fair game for the jury. Well, there may have been some probative value, but I think it was obvious that that was an absolute mistake in the bankruptcy petition. And so what happened is that she was cross-examined on that and held to that other number that was a mistake. Well, didn't she testify it was a mistake? I mean, weren't these arguments made to the jury? Yeah, she did. That was after the defense was able to cross-examine her on this document in the first place. Jury apparently didn't believe her. Why are we supposed to say the jury is not entitled to consider that? Well, again, I just think it's unreasonable to believe that a plaintiff in a civil rights case would put a value of $3,000. I mean, I think, for example, just looking at a case for removal purposes, I think it's just presumed when you see a civil rights case, a wrongful termination case, if someone wants to get into the federal court on diversity... But it's also a real specific number. It's not about $10,000 or whatever. It's what, $33,000, $34,000. I mean, it's like someone sat down with a little... wrote it down and then got their little calculator out and came up with that. Well, Your Honor, actually, that is part of the problem. Because in the first column, there's an exempt value, and that's a statutory exempt value. That's where the $3,400 comes from. And then, by mistake, it was carried over into the actual value column. It was clearly a mistake. I mean, no plaintiff in a civil rights case is going to value the case at $3,000. As I was saying, for removal purposes, they're presumed to be at least worth $75,000, including attorney's fees and that kind of thing. But that's a good argument. And if the court had kept it out and they were arguing on the other side, then I would say, okay, you can't push that rock uphill the other way either. But, you know, there's some of these evidentiary rulings that, you know, it's not what we would have done. But whatever the district court did, they're probably going to be right because there are pros and cons on either side. And abuse of discretion isn't going to trump it. You've got Rule 613 that's referred to in the order denying a motion for a new trial. It says extrinsic evidence of a prior inconsistent statement made by a witness where the witness is afforded an opportunity to explain or deny and the opposite party is afforded an opportunity to interrogate the witness there and is admissible. I mean, if I'm suing somebody for a million dollars and my neighbor says, what's your lawsuit worth? And I say, well, about $3,000. I mean, that's my problem. This is a sworn statement too. Well, Your Honor, I think that would be true if that was the number that someone actually intended to put in the column. That was clearly not the case here. That was an absolute mistake. She was given an opportunity to explain that. She was given an opportunity to explain that. But I think that the prejudicial nature of that evidence far outweighed any ability of the counsel to try and explain that away and redirect testimony of the witness. That was the problem. It was such an obvious mistake. And I think it's no coincidence that the actual verdict amount is that same amount. And I think that shows that. So who's the lawyer that made the obvious mistake? It was either the paralegal, I suppose, or the bankruptcy lawyer who filled out that application. I don't know. Did your side call the paralegal or the lawyer to explain how this figure got in there? No, we did not. We did not, Your Honor. We did have the plaintiff actually try and explain that that was a mistake. But again, I think the nature of that piece of evidence was obviously difficult to try and take the sting out of. It's impossible. That's why we're seeing it. Although with probative, certainly, I think the probative value is very limited because it was clearly a mistake. And the prejudicial value of that was way, way above and beyond the probative value. And it shouldn't have come in. I think... You only got two minutes instead of 10. Do you want to reserve that? Yeah, I think I'll reserve the last one, two minutes. Thank you, Your Honors. Maybe you can inform us at the outset if you're going to divide the time. And if so, what your plans are. Okay. May it please the Honorable Justices of the Court, Dennis Wagner. We're just judges here. Pardon? In the federal system, intermediate court of appeals, judges are just judges. We don't have justice. There's no justice on the Ninth Circuit. Usually, it's people back there that say that before we do. But that's okay. In any event, I'll just take 10 of the 20 because Mr. Boyd has a separate issue. And since the primary argument has addressed fee haw, let me start off with that. This case was nothing more than a shell game, trying to figure out what the legal arguments were eventually going to be. Keep in mind that Ms. Centner, when the district attorney had to do the investigation into the anonymous letter, they tape recorded the interviews. She says she's got nothing to do with the anonymous letter. Her first complaint that she files says, they believe that I was involved with the anonymous letter. The Ninth Circuit comes out three or four years later with the Wasson case. It says, you know what? If you're not speaking, you don't get to claim First Amendment. Now she shifts. I was part of the discussions, part of the letter. The problem that you have in this case is Ms. Centner didn't call anybody. Supposedly four women, including her, are the participants in this anonymous letter. She's the only one that comes in to testify in her case. Laura Coral Flores comes in to testify and goes, yeah, I remember going to dinner. I don't remember participating in any anonymous letter. And you know what? I don't have a problem getting promotions in the department. I'm moving up. So the jury didn't believe Ms. Centner. Now on this FIHA claim, if you look at it, it's very specific. I didn't apply, or I tried to apply for a job. I wasn't allowed to compete. I made these references. Well, we are supposed to look at these broadly, you know, obviously, because you have a situation, you know, that you're claiming that she didn't exhaust. And, but there isn't a box for retaliation. So why should we penalize, you know, a pro per or pro se when there isn't a place to specifically check that? Here's why. Because in the document she sends to FIHA, which is just shortly after she files her claim, apparently responding to some of the questions they had sent to her, the last page she goes, and she's talking about providing the Fisher-Anaya declaration. She goes, here's an insight into the ethics, integrity, and retaliation against employees. She's got nothing in there going, you know, oh, by the way, I've been retaliated against. I don't get pencils. I got moved to an office. They took all my help away. There's none of this, none of this information is in there. And so the idea is that looking at her own letter that she's providing, they're supposed to look at that and go, well, okay, I guess they must be retaliating against you. She never raises the issue. Now, did you claim exhaustion on the summary judgment issue? On the summary judgment issue... Is the answer no? I heard a sigh. I mean, because that's the first thing that we usually claim on, you know, we see on summary judgment. The summary judgment issue was a disaster. She had several FIHA claims. It wasn't raised as to this particular portion of the complaint. And then, of course, we had a two or three-year gap in getting a ruling on the summary judgment. But no. I mean, that's sort of Employment Law 101, exhaustion of administrative remedies. Absolutely it is. So why aren't you just sort of, you know, coming in, you know, why don't you just sort of, everyone kind of assume that that, by then you've developed what the facts are and the depositions and all of that and have some idea of what, you know, why isn't this just sort of an end run here? You know, all I can say is I think that somebody dropped the ball with respect to the MSJ. And ultimately, that would have been me dropping the ball. But the idea is, though, all these issues were raised in the pretrial conference order, which is, of course, the Bible going into trial. I'm not sure, you know, I mean, Judge Clifton raised the point about how would it have been any different? I'm not sure that, you know, some of the, you know, I will say that the county's conduct didn't seem to be exemplary in the way that they handled this. And it did seem that they were, you know, interested in just rooting out people that, you know, were whistleblowers or sent in these anonymous letters. Um, how do we know that had the retaliation, had retaliation been to go to the jury, how do we know it would have come up with the same $3,400 verdict? Well, I think that's the ultimate issue is, is that if it's essentially the same thing that went forward on the First Amendment issue, the jury made the determination of $3,400, whatever it was, you know, that's the verdict in the case. But could you make the same arguments to the jury if there wasn't a retaliation claim? I mean, was a lawyer for the plaintiff allowed to make the same arguments that she was singled out because she was, you know, had been identified as the letter writer? Could they make that argument? They made that argument. So they made that argument. The arguments didn't change with the omission of the FEHA claim. Indeed, wasn't that what the First Amendment argument was? It was a retaliation for exercise of First Amendment rights. Absolutely. Was there any factual difference between the two claims? Absolutely not. And there was a discussion amongst counsel in the court at the start of the case. The court deferred at that time. A very patient district judge with the attorneys in this case. So ultimately, the issue is, is that even if it was a mistake, it doesn't change the outcome of the verdict. The jury, obviously, did not like Boyd in some respects. They did not like Ms. Centner in some respect, and gave her what it is that she had put on a document. Now, with respect to the bankruptcy petition, my cross-examination of Ms. Centner pulled out two pages. Her signature page on the document, and another page which says, list all your lawsuits. The plaintiff's counsel, Mr. Hansen, is the one who went into the specifics, the value of the case, and went over that issue. Granted, that was his call, I guess, in terms of trying to remedy what the issues were at the time of trial, but clearly, it's an inconsistent statement. It was offered for impeachment. I know that some of the briefing talked about a judicial estoppel argument or something like that, and no one instructed anybody on that, and no one was even arguing anything such as that. Clearly, the bankruptcy schedules, they were proper for impeachment. She had an opportunity to explain. The jury didn't like her explanation. The jury didn't believe her. She was impeached repeatedly throughout the trial. What about the notion that the identity of the defendants would affect the calculation of damages? It is true that the county's pockets would be substantially deeper than Mr. Boyd's, and the jury would likely perceive that. Is that a basis for saying that the plaintiff ought to be able to present the damage question to the jury in the context of a theory that makes the county liable as well? Going back to the fee hawk claim, should that have gone to the jury so there's another box for the jurors to fill out, and even though the attorneys would be arguing that it's all the same thing, that you don't get multiple upon multiple upon multiple recoveries, the issue is, did she have a free speech violation? Was there causation? What are her damages? Clearly, the jury made the determination as to what they thought of her case. I don't see it. I don't see any benefit in going back on that limited issue. But unless the Court has any further questions, I'd be happy to respond. Looks like we don't. Thank you very much. We'll look to your colleague. Good morning. Chris Monkwood for Clyde Boyd. The FEHA claim does not apply to Mr. Boyd. It was dismissed as to him. So I'm going to focus on the cross-examination issue instead. We raise three separate reasons why the verdict against Mr. Boyd is not supported by the evidence. I'm going to start from reverse order. There are a list of things the plaintiff contends were the adverse employment actions, but none of them were ever linked to Mr. Boyd. She talks about, about the promotions. There was no evidence that he had any say on the promotions, and there was positive evidence. It's all civil service. Plaintiff put in no evidence about the pool of other applicants. She complained about transfers. There was no evidence that he had any say in any of the transfer decisions. She complained about workload. No attempt to link that to Mr. Boyd. It also talks about the temporary employees and equipment problems. Once again, no attempt to link that to Mr. Boyd. There just isn't any evidence that he did anything that the plaintiff contends constituted the adverse employment action. Getting back to the question of whether there was any of that. Let me have you pause for a second, because I've got to be honest. What I just heard you say isn't what I remember reading in your brief. Well, I did read, I did raise that. I put it under the label of causation, but that's what it is. I can tell you where it's at if you want to. Page 41. Starting with page 41. And look at page 43, it says, plaintiff's complaints of adverse employment actions fell into four general categories. She failed to link any of them to Boyd. And then I go through in detail. So I did raise the issue. Second one is that the speech has to be protected by the First Amendment. Plaintiff took credit for only a pretty small portion of the anonymous letter. And none of those portions are a matter of public concern. We're talking about the alleged affair. All right, well, wait a second. Letter that they talk, they use some words like misuse, the misuse of public funds, wastefulness and inefficiency in managing and operating governmental entities. If she had taken credit for those portions of the letter, I'd agree with you. But her testimony was very limited. She took credit for very small portions of that letter. It's not speech by somebody else. The Watson case pretty much nails that issue. The question is, what did the plaintiff herself say? The portion that she took credit for were the alleged affair and that only very limited portion of that. The fact that Mr. Boyd was appointed as affirmative action officer. The alleged dressing down of employees in Kirby. We have a lot of remarks about them. And the fact that Mr. Boyd's car had emergency lights on it. She didn't complain about the waste of funds. She simply said he's not a police officer. Therefore, he shouldn't get lights. That's the extent of her portion of her own testimony. None of those qualify as a matter of public concern. So you get to parse the letter and the jury's not, can't look at that letter and circumstantially decide that it's protected speech. I think we look at plaintiff's own testimony about what she said was her portion of the letter. And you look at her own testimony, that's the limited portion she said was her speech. Speech by somebody else. She, there's no protection for her because somebody else gave the speech. And I think the next step is the qualified immunity analysis. This takes place between 1995 and 1997. There is no clearly established law holding that speech of the four things the plaintiff herself took credit for, qualified as a matter of public concern. The second half, though. Did you make a qualified immunity argument at summary judgment? Same question. The whole purpose of qualified immunity to some extent being to avoid trial. Now, I know that you can properly make one later, but if your whole point is to avoid trial and that, you know, if there's no evidence of that, that would certainly seem to be logical. I don't know the answer because I didn't write the motion. My recollection, though, was at the time the plaintiff hadn't taken the position that she took at trial, that she had a very limited portion of the letter from which she was taking credit. This case goes back nine years, and I wasn't involved in that portion of it, so I don't know the answer. Second half analysis, though. Even if it is a matter of public concern, then you get into the balancing process. There is undisputed evidence of pretty major disruption caused by the letter. I guess when I look at the behavior here, it almost to me falls in the category, do people know that killing someone is clearly established, you know, violating someone's clearly established constitutional rights. I mean, I think that it was clearly established at the time, but, you know, I'm willing to listen to what you have to say. But I'm actually somewhat surprised that, you know, I think that your client is fortunate that the $3,400 number came in, because I think otherwise the verdict probably would have been different. Well, I think that is partly a reflection of the very limited portion of the letter for which the plaintiff took credit. I think that does factor into this. But I think it's important to focus on the very small portions for which she took credit. There can't be retaliation for speech by somebody else. So we're going to need to focus on her portion. And the portion that she herself said is her portion does not address a matter of public concern or between the 1995 and 1997 time period, a reasonable employee would believe that it does not qualify as public concern. The balancing process has caused pretty major disruption. And I think a reasonable employee during the same time period would believe that to the extent, if any, there's any public concern, the disruption caused by this outweighed by the fact that she did not have any evidence that Mr. Boyd did anything. So the question is, under a clearly established analysis, you're not supposed to retaliate for something. You have to have some retaliation before you get to that issue. And there isn't any evidence that Mr. Boyd, as opposed to defendants collectively, did anything. Well, if the jury had believed that Mr. Boyd didn't do anything, wouldn't they have come back with a defense verdict for Mr. Boyd? It seems to me that they saw the inferences a little bit differently than you're seeing them right now. I have read the record on this one, and I looked for evidence to support the contention they did something. I didn't find any. I went through plaintiff's briefs looking at the same issue. And the entire brief the plaintiff came in is Mr. Boyd had a motive. Let's assume that to be true. So what? Unless you do something, the motive gets you nowhere. This was a pretty long trial, and the evidence was contradictory and confusing in a lot of ways. But on that point, it's pretty clear there just isn't any evidence that Mr. Boyd did anything. Did Boyd testify? Yes. What did he say he did or didn't do? He expressly said that he has nothing to do with promotions, nothing to do with the transfer decisions. I can give you the, let's see if I have that one. I cited all those pages, and I filed a supplemental excerpt of the record, and those pages are all in there. Yeah, and what is there, if anything, to impeach or rebut that testimony in this record? From the plaintiff's side, nothing. The promotions are all undisputedly civil service. And of the transfers, the plaintiff had this very vague contention that transfer decisions were made by administration. There was never any attempt to link administration to Mr. Boyd. But she testified to that effect. That administration made decisions. The question is, is Mr. Boyd administration? She never provided evidence of that. All right, but if the jury believed that transfers were made by administration, if they believed her testimony, wouldn't that in and of itself sink Mr. Boyd's ship? I think you need something to link administration in general with Mr. Boyd. Well, yeah, we can always say you'd like other evidence, but we have to go with what the evidence was that the jury heard. And if that's an inference that can be made, and that's obviously, then that would be something that would support the jury verdict. I think it's speculation at that point. It has to be evidence, not just speculation. And I think that's what's missing. So it's whether it's an inference or whether it's speculation. If it's an inference, you lose. If it's speculation, you win. And reasonable inference. It can't be something which is beyond what a reasonable jury could infer from the evidence. I just don't think it's there. I've briefed the issues pretty much in detail on the bankruptcy issues. Unless the Court has any questions, I'll submit. Looks like that's it. Thank you. Rebottle? Thank you, Your Honor. Very quickly. First point, sir, Mr. Boyd denied any wrongdoing. And the jury didn't believe him because I put on the witness. But what evidence did you have that he did anything? Right. I just took another look at counsel's brief. And under the causation section, the allegations are made that there's nothing that ties Mr. Boyd to any of these activities. There's nothing that ties him to promotions. There's nothing that ties him to transfers. There's nothing that ties him to workload. So then I immediately went to your answering brief to find out what did tie him to those things. And there's absolutely nothing that ties him to any of those things in your brief. Nothing. Your Honor, what the jury, the evidence the jury relied on was the testimony of Rosemary Fisher Nye, who is the Assistant Division Chief of the Child Support Division, who testified at trial. On the second day of her employment, she had a meeting with Mr. Boyd, who went on and on and on about the anonymous three-page letter, identified Ms. Centner as the author of the letter, and said, do not promote or transfer and essentially isolate anybody who was involved with the letter. And he went through a list of other people. So the jury listened to Mr. Boyd's testimony and didn't believe him. They listened. He didn't want to. He was saying to Ms. Fisher, who wasn't in a position to make promotion decisions, don't promote her. But was Mr. Boyd in a position to say that to somebody else who was in a position to make those decisions? Well, I think, remember, Ms. Fisher Nye was in charge of the administration of the Child Support Division. Her policies would go down the chain of command to direct supervisors and middle-level supervisors. Mr. Boyd was tallying the Assistant Division Chief. Remember, Mr. Boyd was the head of the Child Support Division. He said, do not promote, do not transfer and essentially isolate anybody involved with this letter. And the jury heard that testimony. That's the testimony that you're relying on to tag Mr. Boyd out for this charge? Correct. Because it was a direct testimony. Fisher Nye's testimony? That's right. Well, there was also testimony from Ms. Centner's direct supervisor, Gene Williams, who, when I questioned him on the stand, said he had no authority to okay transfers or promotions for Ms. Centner. It all had to go through Mr. Boyd. So there was this choice. It would have been nice if you were to put this in your brief that I just read. It's not there. Yeah, you know, I agree. The part about the Gene Williams direct supervisor testimony was not in there, and I apologize for that. But that is what came out of trial. But I think, fundamentally, the jury looked at the testimony of Ms. Fisher Nye. It was a direct admission made to her by Mr. Boyd that you shall not transfer, you shall not promote, and you shall isolate anybody involved in the letter. And in that meeting, he identified Ms. Centner as the author of the letter. So I think there was plenty of evidence there for the jury to come to the conclusion that she was denied transfers because of her involvement with the letter. A final point on the, you know, what difference does it make if we reinstate the Feehock claim or even amend the judgment and allow the Feehock claim? It does make a difference, in one respect, the way the district court judge calculated the fees. What he did is he took the number of original defendants in the case, divided the fee request by that, got it down to about one-sixth. Then he took the number of claims that didn't go to the jury, took that number and divided it again into what was left over of the fee award. It came up with a much smaller number. So if the Feehock claim is reinstated and the county is on the hook for the Feehock claim as well as Mr. Boyd, that means the district court judge on remand would have to recalculate the fee award, which would obviously make it go back up. Now, this is a civil rights case. There's a fee-shifting provision here. That's a very important part of these civil rights cases, you know, what happens to the fees and that the employer or the, you know, the pay of the attorney's fees here. And that affects the ability of attorneys, plaintiff's attorneys, to take these cases on contingencies. It affects the amount of money the plaintiff gets. So that is a real-world problem here with what happened at the district court level based on the way the trial court judge actually calculated the fees. Was that Judge Timlin? I know. It was Judge Carney. It was in front of Judge Timlin originally and then it got transferred to Judge Carney for trial. Is that why it took three years to get to trial? Well, actually, it took a little longer than that, but there was some delays in the case getting to trial, Your Honor. We thank you. Thank all three of you for your arguments. The case just argued is submitted. We'll take a brief five-minute break to give counsel a time to reassemble themselves and we'll return in about five minutes. Court is in recess.
judges: Trott, Clifton, Callahan